SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

PRINCETON ECONOMICS INTERNATIONAL, LTD., Princeton Global Management, Ltd., and Martin A. Armstrong, Defendants.

No. 99 Civ. 9667(RO).

United States District Court, S.D. New York.

Oct. 8, 2004.

Helene T. Glotzer, Stephanie D. Shuler, Securities and Exchange Commission, for Plaintiff.

Alan M. Cohen, Tancred Schiavoni, Martin Glenn, O'Melveny & Myers, LLP, for Receiver.

Stephen Jay Obie, Commodity Futures Trading Commission, Thomas V. Sjoblom, Benjamin R. Ogletree, Chadbourne & Parke, LLP, for Defendant Armstrong.

David Cooper, Steven Legon, Martin Armstrong, Defendant pro se.

## OPINION AND ORDER

OWEN, District Judge.

In September 1999, defendant Martin Armstrong, the then CEO of Princeton Economics, et al., was indicted and he and his corporations proceeded against civilly, on charges of a Ponzi scheme, under which investors were defrauded in the area of $1 billion dollars. Alan M. Cohen as the receiver of his corporations was appointed by Judge Kaplan. Shortly thereafter an order was issued by me in this Court directing Armstrong to turn over to the receiver certain corporate assets roughly worth $15 million which had been purchased with corporate money. These consisted in substantial part of almost $1 million of gold bars, some $7 or $8 million of valuable coins, and an historic bust of Julius Caesar, all of which Armstrong had taken into and was keeping in his personal possession. He did not comply with that order and in January 2000, Armstrong was found in civil contempt and placed in the New York Metropolitan Correctional Center to compel compliance. He, however, has never complied with that order and remains confined in the MCC to this day though over the past four and a half years he has been repeatedly brought before this Court in an effort to induce compliance but without success.

Armstrong has appealed to the Court of Appeals innumerable times after many of these District Court appearances, endeavoring to vacate the civil contempt confinement order but also without success. The Court of Appeals has declined this in all of its numerous opinions along the way, stating for example on March 18, 2002.

Armstrong had the burden of producing evidence to show that he cannot comply with the order. The district court observed that Armstrong has come forward with none. On appeal, Armstrong does not challenge that finding (or cite any new evidence).

Significantly, while the coercive effect of the initial contempt order decreased as the expiration date drew near, the July 6, 2001 order contains no expiration date. With the dismissal of the instant appeal, Armstrong will for the first time be faced with the prospect of indefinite confinement.

At the beginning of this very summer, June 3, 2004, I had Armstrong produced before me inquiring into his state of mind as to compliance with the turnover order and at that time stated to him as the transcript reads:

Mr. Armstrong, you have now sent to me for the Circuit an affirmance of your continuing detention here, dated 26 February 2004, for Judges Walker, Calabresi and Cabranes, which, among other things, they observe that you do not challenge the district court's finding or cite to any new evidence that would suggest to the district court that you could not comply with the turnover order. That is a quote. And they affirmed the discretion of this court to continue to trust that at some point the $15 million of materials would be turned over. This is against a Court of Appeals review of March 18th of 2002.

I have gone back through about seven or eight transcripts looking at what you have been telling me. January 7th of 2002, at that point stating to me that, quote, I spent two years in prison supposedly because I am the director of the institute. February 22nd, among other things, you say, page 51, you have never been given an inventory of what was to be produced, among a number of other things.[1] June 19 is the Mexican standoff quote on your part. Quote, you [referring to the Court] will not change your opinion on my Fifth Amendment and I cannot comply, so I will have to go to trial and at that point we will have to deal with the real issues. September 23rd is the interesting day where we got on the record finally through Mr. Cooper [one of his many lawyers] acknowledging that in the Fifth Amendment context you did in fact say that you do not have to turn over anything. November 7th of 2003, you reiterate again, I have never received an inventory of what was produced or what is claimed to be missing. I don't know what I have to turn over, page 39. When you were asked about are you going to turn anything over, at the prior time you had said that you just don't want to. You said, well, my position is, quote, I haven't made a decision. December 15, 2003, you took the position you didn't have to turn it over because, quote, I don't believe it is constitutional, page 41.

... February 23rd of 2004, when I made the observation on which we would see $15 million worth of coins in [sic, "and"?] gold bars, your answer to me was, perhaps if we go to trial and I can prove my innocence, we might find something very important as to who is actually covering up for whom in this district.

Now, I have gone through all of this, obviously the teedying [sic, I doubtless said "tedium"] of the Court of looking it up, the teedying of of everybody in the room having to listen to me recite it, because you have now been in going on four years, right?

MR. ARMSTRONG: Four and a half years.

THE COURT: As a United States district judge, I find it just incredibly distressing that with all of that review and with the Second Circuit's review and their observations and my observations and your various positions, I don't have to, I don't want to, I have no need to do it, I have the Fifth Amendment of the Constitution—let's put is this way. It bothered me, as one of my children once said, that the United States District Court can, in my opinion, be played with as you have done with us in this period of time. It seems to me perfectly clear that you do have the power to turn over this material, which is not inconsequential, as the Court of Appeals has said, and, yes, a lot of time has passed, and, yes, it is a lot of money, and I do feel it is there to be gotten and that you are engaged in your, quote, Mexican standoff with us. I am continuing to stand.

Now, I observe to you again the opportunity is here to comply with this. As you know, and we all know in this room, Mr. Kirwan has no real record, whatever you gave him, anything, Mr. Setogawa, you say you put a million dollars of gold bars in the trunk of his rented limousine and he drove off in New Jersey, with not one single scrap of paper you gave him any of that. So the

---

**1.** [Footnote by the Court] The Court of Appeals had earlier requested and was given an inventory, copy to Armstrong.

Court of Appeals has, in my view, observed with the same sense of astonished skepticism that you continue to maintain that these are defenses to a perfectly obvious turnover.

At this point I felt it was appropriate to bring you over since the Court of Appeals sent me most recently, which was given to me on the 7th of May saying we deny the appeal, to give you another opportunity so that nobody can contend that you are not being given every chance to comply.

So I put to you again, are you going to or are you not going to?

MR. ARMSTRONG: Your Honor, I think that the opinion of the Court of Appeals, your Honor, throughout this case has always declined to accept jurisdiction. They have never reached the merits of anything, and in this last order they directed that a habeas corpus be filed to create a record for them to review. Now Mr. Sjoblom's firm, Chadbourne & Parke, is in the process of doing that.

I had Martin Armstrong brought before me again just a few weeks ago, September 23, 2004.

That hearing was quite brief on this subject:

THE COURT: There has never been a statement to this Court or them or anybody else that you could not comply; it just was that you wouldn't comply. That is really where we are at.

You have brought a habeas petition through counsel, and I will get to that, I suppose, in a little bit here. I take it your position, as far as a production of things under the contempt order, your position is exactly the same as before, which is not that you can't but that you

don't have to and you don't want to. That is really where I continue to see you are at.

MR. ARMSTRONG: Your Honor, I cannot find any case post indictment where anybody—

THE COURT: I am not looking for any cases. I am looking for your state of mind. Does that continue to be your state of mind?

MR. ARMSTRONG: My state of mind is that I stand upon my constitutional rights.

THE COURT: OK.

At this point, on October 1, 2004, one week after the above, Armstrong wrote a letter to Judge McKenna who is presiding over his criminal case which states:

Your Honor:

By now you are probably aware that on September 22 Judge Richard Owen reviewed the contempt and continued it indefinitely and thereby has already decided the habeas by default. There is *no* realistic possibility of my release by Judge Owen ever. It is unlikely that the Second Circuit will be in a position to rule until next fall when I am about to begin my (7th) year of imprisonment.

This erroneous blanket attack is what occasions this opinion as a followup to the hearing before me on September 23, 2004 quoted above.

As a sort of preface, I note that the Court of Appeals on March 18, 2002, wrote with understandable concern, humanity and hope, "[T]here is surely a limit of how long someone will choose to stay in jail, even for $14.9 million, but we see no basis for rejecting the district court's finding that Armstrong's incarceration continues to serve a coercive purpose." [2]

2. Earlier in the same opinion the Court of Appeals had written: "True, Armstrong has been confined for more than two years, but the length of his confinement must be viewed

And two years after the above, as recently as last February—just a few months ago—the Court of Appeals (2/24/04) again visited these issues on the most recent appeal by Armstrong, and stated in pertinent part:

> In January 29, 2003 and June 19, 2003 hearings, the district court determined that, notwithstanding the additional passage of time, the civil contempt order continued to have a coercive effect on defendant-appellant Martin Armstrong. Specifically, it found that Armstrong still had produced no evidence that he had attempted to or was unable to comply with the turn over order.

> \*    \*    \*    \*    \*    \*

> As we stated in *Armstrong III*, "Armstrong had the burden of producing evidence to show that he cannot comply with the order," 284 F.3d at 406; *see also Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir.1995) ("the alleged contemnor's burden is to establish his inability [to comply] clearly, plainly and unmistakably"). And, on this appeal, Armstrong does not challenge the district court's finding or cite to any new evidence that would have suggested to the district court that he could not comply with the turn-over order. Rather, he argues that the length of his confinement (now nearing four years) combined with his repeated declarations that he will not comply with the turn-over order, compel the conclusion that, in fact, he will never comply; thus he maintains that the contempt order has lost its coercive effect.

> \*    \*    \*    \*    \*    \*

> in the light of the value of the concealed property, which is unusually great. Furthermore, we agree with the district court that *the coercive effect of Armstrong's incarceration has*

In sum, the record reveals that the district court continues to "conscientious[ly] consider [    ]" Armstrong's individual circumstances, *Simkin*, 715 F.2d at 37, and has heeded our requirement that it make "a careful reassessment of [the] coercive potential" of the contempt order. *Armstrong III* 284 F.3d at 406. Indeed, at each hearing, it has considered all of the relevant factors and determined that there was a "realistic possibility that Armstrong w[ould] comply," *Id.* citing *Simkin*, 715 F.2d at 37.

We conclude, therefore, that the district court did not abuse its discretion by continuing Armstrong's confinement and we dismiss for lack of appellate jurisdiction without prejudice to any remedy under § 2241 or 2255. We base this decision, in part, on our believe that a ruling squarely addressing the merits of Armstrong's arguments will streamline the ultimate resolution of this case.

> \*    \*    \*    \*    \*    \*

> However, we need not decide the status of such a habeas remedy today because Armstrong has not yet petitioned the district court directly for habeas corpus relief on the basis of his Fifth Amendment or 28 U.S.C. § 1826 arguments nor developed a record below. Accordingly, those issues are not, at this juncture, properly before us. *See* Fed. R.App. P. 22(a).

The above quote is now particularly apt given the subsequent filing and present pendency before me of just such a habeas corpus petition prepared by one of his attorneys which is to be heard on November 3, 2004. Accordingly, I am of the view that certainly as of this moment, Arm-

*likely been attenuated somewhat by the pendency of his various appeals and petitions for extraordinary relief."* (Emphasis supplied).

strong's incarceration retains some amount of coercive force. Whether a fair assessment of the habeas petition filed at the Court of Appeals' suggestion and the government's response—which has not yet been filed—ends this or continues to leave the pending order with some assessable remaining "coercive potential", 284 F.3d at 407, remains to be seen, but does not require a District Court's consideration of these issues until such time has come.

So ordered.